THE STATE OF FLORIDA VS. JAMES W. JOHNSON, ATTACHMENT FOR CONTEMPT.

The Constitution of this State, (1868,) Article VI, Section 5, provides that "The Court shall have power to issue writs of mandamus, certiorari, prohibition, quo warranto, habeas corpus, and also all writs necessary or proper to the complete exercise of its appellate jurisdiction. Each of the Justices shall have power to issue writs of habeas corpus to any part of the State," &c.: *Held*,

1. That this is a general grant of power to use certain writs in the exercise of its jurisdiction, and that it is competent for the Legislature to prescribe the manner of obtaining and issuing process, and to provide that such process may be issued out of the Supreme Court in vacation as well as in term time; and the provisions of the Constitution do not repeal or invalidate acts of preceding Legislatures, authorizing Justices and Judges to allow supersedeas, writs of errors, and other process, and prescribing the effect of such process.

2. A supersedeas granted upon an appeal from an order allowing a preliminary injunction and appointing a receiver *pendente lite*, suspends the operation of the order and prohibits the further action of the receiver in carrying out the mandate of the order from which the appeal is taken.

3. When an appeal is taken and a supersedeas allowed from an order appointing a receiver, *pendente lite*, the power of the Court making the order and its officers is suspended in reference to the order appealed from, and the order remains inoperative pending the appeal. Any action or proceeding by any person under such order, in disregard and defiance of the force and effect of the supersedeas, after notice thereof or after service of a writ of supersedeas, is a contempt of the authority and jurisdiction of the appellate Court.

A statement of the case is contained in the opinion of the court.

Justice WESTCOTT, being disqualified, did not sit in this case.

*S. J. Douglas, Papy & Peeler*, for the State.

*J. J. Finley* and *G. P. Raney* for Respondent.

RANDALL, C. J., delivered the opinion of the court.

On the 11th day of August, 1869, James M. Baker and Wilkinson Call filed their bill in chancery in the Circuit

Court of Leon county, against Franklin Dibble, Calvin B. Dibble, George W. Swepson, M. S. Littlefield, John P. Sanderson, Edward M. Cheney, Alonzo Huling, Silas L. Niblack, The Tallahassee Railroad Company, The Jacksonville, Pensacola and Mobile Railroad Company, and Harrison Reed, Governor of Florida, alleging certain matters concerning the purchase by the complainants and several of the defendants of the Pensacola and Georgia Railroad and the Tallahassee Railroad, and property and franchises of said Railroad Companies, which said railroads had been advertised and sold by the Trustees of the Internal Improvement Fund of the State of Florida.

On the 27th day of August, the Judge of the Second Circuit, on the petition of the complainants, made an order that said cause be transferred to the county of Columbia, in the Third Circuit, to be heard and determined before the Judge of that Circuit, and that the Clerk of Leon Circuit Court be required to forward the papers in said cause to the Clerk of the Circuit Court for Columbia county, together with a certified copy of said order. This order was filed by the Clerk of Leon county September 13, 1869.

On the 18th of September, 1869, the complainants presented a petition to the Hon. A. A. Knight, Judge of the Fourth Circuit, stating that the Hon. T. T. Long, Judge of the Third Circuit, was absent from the State, and asking that the Judge of the Fourth Circuit take said cause under consideration, and to grant such orders and decrees as he might deem proper, &c.

It does not appear that the papers in said cause were transferred to the Clerk of Columbia county, but that on the 18th of September the petition of complainants was filed with the Clerk of Duval county, and on the 20th September the bill was also filed in the office of said last named Clerk, and on the 20th September the Judge of the Fourth Circuit allowed an injunction, which was issued by the Clerk of Duval county.

On the 21st of September complainants filed an amendment to the bill praying that a Receiver be immediately appointed; and on the same day said Judge appointed James W. Johnson as Receiver, and directed him to take possession of said railroads, and their properties, rights, credits, effects, trains, engines, equipments, receipts and money, and that said Receiver continue the running of the trains on said roads, and operate and manage the same efficiently and with economy, and regard to the safety of the public and their convenience; and further, " that said Receiver shall execute and perform the public trust and obligations created in the charter of said P. & G. R. R. Company, and in the agreement of the purchasers of the said railroad, in the extension of said railroad to the Chattahoochee river; and shall apply the net proceeds of the earnings of said railroad to the extension of said Pensacola and Georgia Railroad as located by said company." That said Receiver pay the expenses of operating said roads; that the officers, agents, and employees of said. P. & G. R. R. Co., and of the Tallahassee R. R. Co., deliver all property, money, &c., of said roads to said Johnson, as Receiver; that said Receiver be vested with all necessary powers in the premises without further order; that he give bond in the sum of $20,000 for the faithful performance of his duties; and that all contracts for the extension of said road be reported to said court for reference, examination, and approval by the masters of said court. Which said order was filed and entered by the Clerk of Duval county.

In pursuance of said order, the said Johnson, as Receiver, filed a bond, which was approved by said Judge and filed with said Clerk.

On the 12th of October, 1869, the. defendants appealed from said orders to the Supreme Court, and presented to the Chief Justice the record in said cause and a petition accompanied with a bond in the sum of $20,000, in due form, ap-

proved by said Circuit Judge, asking that said appeal should operate as a supersedeas pursuant to law.

The Chief Justice " thought fit to order and direct" that said appeal should operate as a supersedeas and stay of proceedings, and that the Clerk issue the necessary process, to be directed to the Judge of the Fourth Circuit, and reciting also what to him seemed to be the effect of such supersedeas, and also that the process be directed to and served upon said Johnson, directing and informing him of his duty in the premises, as follows: "And you, the said James W. Johnson, Receiver, are hereby commanded that you restore and surrender the Tallahassee Railroad, called in said interlocutory decree and order the Pensacola and Georgia Railroad and the Tallahassee Railroad, and the moneys received by you from the operations of the same to the Tallahassee Railroad Company or to Franklin Dibble, the President thereof, or other proper officer of said company, except so far as you have paid out the same in operating said road or roads according to said interlocutory decree and order, and that you make such restitution, surrender, and return without delay."

(It appears that the Legislature at its late session, after the sale of the P. & G. and the Tallahassee Railroads by the Trustees of the Internal Improvement Fund, incorporated the purchasers, or some of them, with other persons, by the name of the " Tallahassee Railroad Company," the said purchasers being " F. Dibble and associates," as stated in the said bill of complaint, and also that said F. Dibble was the acting President of said Tallahassee Railroad Company.)

Afterwards, on the 21st day of October, 1869, at a term of the Supreme Court, it was made to appear to the court that notice of said appeal and order, in the form of a writ of supersedeas, had been served upon the Judge of the Fourth Circuit, and upon said Receiver Johnson, and that said Johnson, upon proper demand made, had refused to recognize the order and to comply with the terms, or with the legal effect thereof, by refusing to surrender the said railroad,

property and effects, and that he persisted in acting as Receiver under the order which had been so suspended and made inoperative by said appeal and supersedeas, and by himself and his agents continued to demand the revenues and moneys earned by said railroads, all which actings were considered unlawful and in contempt and defiance of the jurisdiction and authority of this court, whereupon this court, in consideration of the premises, directed a writ of attachment to be issued against the said James W. Johnson, for the purpose of bringing him before the court to answer for the alleged contempt. The attachment having been issued, was afterwards returned by the sheriff with an endorsement by him, stating that he had arrested the said Johnson on the 23d day of October, and that Johnson had been taken out of his custody by means of a writ of *habeas corpus* issued by the Hon. A. A. Knight, Judge, &c., and discharged. Annexed to the return was a copy of the writ of *habeas corpus* and of the order of discharge attested by the Judge, but this court was not informed of the reason why such discharge was ordered. And forasmuch as this court did not perceive that said Johnson had been legally discharged by said Judge, or why the process of this court had been thus interrupted and set at naught; and because this court is the proper judge of its own jurisdiction, and of what writs and process it may lawfully issue in the exercise of its functions under the Constitution and laws; and denying that any other tribunal has been created which may lawfully prohibit the exercise of its ordinary jurisdiction, we saw fit to direct another writ of attachment to be issued against said James W. Johnson, requiring him to be brought before the court to answer the premises.

On the 3d day of December, 1869, the sheriff returned this writ of attachment served, and produced said Johnson before this court. On the 4th of December said Johnson, by his counsel, filed an answer in writing "acknowledging the authority of this court to inquire into, adjudge, and de-

termine what is a contempt against its authority; but exercising the right of defense conferred upon him by the laws of the land, he says he has not been and is not guilty of the alleged contempt." And he further denies the authority of the Chief Justice of this court to grant a writ of supersedeas; and further denies the power of the Supreme Court, or a Justice thereof, to superadd to a writ of supersedeas an affirmative mandate which gives to said writ a retroactive operation, as is done in this case. That as a Receiver appointed by the court below, whose officer he was, the writ of supersedeas and the affirmative mandate thereto attached, could not legally reach him as such Receiver, except through the court by whom he was appointed and under whose orders he acted, and that he has never received any orders from that court commanding him to surrender the said property mentioned in the order appointing him; and prays to be discharged from said writ of attachment. And the counsel further stated to the court "that the respondent had not complied with the supersedeas and mandate of this court."

Hereupon the counsel who moved for the issuing of the writ of attachment objected to the consideration of all that part of the answer which sought to question the regularity of the issuing of the supersedeas and mandate of this court, and moved, upon the admission by the respondent that he had not complied with such process, that the respondent be committed to the jail of the county of Leon, until he shall purge himself of the contempt committed in disobeying such mandate, the said writ and mandate not having been set aside by the court in the cause wherein it was issued. And it was then and there announced by the court that this motion must be granted, and that the court would not consider in this proceeding the regularity of the proceedings under which such supersedeas was issued; but the counsel of the respondent desiring to be heard upon the question as to what degree of punishment ought to be inflicted upon the respondent, were allowed to do so, and to present to the

The State vs. Johnson—Opinion of Court.

court the several matters contained in his answer.   And in view of the importance of this case, and of the actings of the said respondent in the premises, and of the public interest that has been excited in some portions of the State, (by means which may be considered somewhat extraordinary,) we proceed to present the whole matter as it appears to this court.

It has been suggested that a Justice of the Supreme Court cannot lawfully issue any writ except the *habeas corpus.*   To which it may be answered that in this matter neither of the Justices has issued any writ whatever.

The Constitution says:   The Supreme Court shall have appellate jurisdiction in all cases of equity.   *   *   The court shall have power to issue writs of mandamus, certiorari, prohibition, quo warranto, habeas corpus, and also all writs necessary or proper to the complete exercise of its appellate jurisdiction.   Each of the justices shall have power to issue writs of habeas corpus, &c.

If this general grant of power to issue the enumerated writs, and also all the writs necessary or proper to the exercise of appellate jurisdiction, sweeps away all the statutes regulating the practice of the court, so far as those statutes authorize any act to be done by a justice of the court, as a preliminary to the issuing or giving effect to any process of this court; and if it so circumscribes and defines the powers and duties of the justices, that any statute authorizing any order or act of one justice in any proceeding, (except the habeas corpus,) not expressed in the Constitution, is abrogated, it follows that no process can be issued out of the Supreme Court, except by its order in term.

If this is a correct view, then have the Justices of the Supreme Court of this State from its earliest organization been in the practice of making orders not warranted by the Constitutions under which they acted, and of acting upon orders and processes illegally issued.

The first Constitution (1838), Art. V, Sec. 2, says that

the Supreme Court shall have appellate jurisdiction only, "provided that the said *Court* shall always have power to issue writs of injunction, mandamus, quo warranto, habeas corpus, and other such remedial and original writs as may be necessary to give it a general superintendence and control of other Courts." The Constitution of 1865 repeats this language *verbatim*. The language of the Constitution of 1868 is, as already shown, substantially the same.

The Legislature has in several instances provided the mode of issuing process out of the Supreme Court, and also provided the manner of obtaining a supersedeas. The act of February 10, 1832, Sec. 7, (Duval, 109), says: "All writs of error shall be tested in the name of the Chief Justice and shall issue *on demand* as a matter of right, from the office of the Clerk of the Supreme Court or from the clerk of the court in which such judgment has been rendered; but no writ of error shall operate as a supersedeas unless by the special order of the said court or some Judge thereof, made upon inspecting a copy of the record."

The act relating to appeals from final decrees, passed February 11, 1832, says: Every final decree shall be made and pronounced in open court, and the plaintiff or defendant may appeal from the said decree at any time within two years; provided, however, that the same shall not operate as a supercedeas unless the appeal be taken within the time fixed by law in other cases, or if not taken within that time, upon an *order* of one of the Judges of the Supreme Court *directing* the said appeal to operate as a supersedeas.

The act of 1847 relating to writs of error in criminal cases, sec. 3, says: That a party convicted of crime or misdemeanor not capital shall be entitled to a writ of error to the Supreme Court on the following terms: He shall obtain from the clerk a copy of the record of the case, duly certified, and cause the same, together with an assignment of error relied on for reversal of the judgment, to be presented to the Supreme Court, or to *one of the Justices* there-

of, and if such Court or Justice shall be of opinion that there is just cause for allowing a writ of error, he shall so indorse on such record, and thereupon a writ of error shall issue from either the Circuit or Supreme Court.

The act of 1852, sec. 3, relating to appeals from interlocutory orders and decrees, contains the proviso, "that such appeals shall not operate as a supersedeas unless the Judge of the Circuit Court or a Justice of the Supreme Court, on inspection of the record, shall think fit to *order and direct* a stay of proceedings."

Before the passage of this act no appeal was allowed except from a final decree. The preamble to the section explains the reason of the enactment. It often happened that an interlocutory decree or order made important changes in the relation of parties and their property, and gave occasion for delay, and often of great expense, which decree or order may have been erroneous, whereby, after years of litigation, a final decree may have been set aside by the appellate court. The object of this statute of 1852 was to give parties a means of correcting such errors without the great sacrifices and inconveniences arising from the postponement of an appeal until a final decree. This act provides for the supersedeas upon terms similar to those required in case of a final decree, to-wit: The giving of adequate security and the order of one of the Justices directing the appeal so to operate.

It has been the very general practice, as appears upon an inspection of the records of the Supreme Court of this State, when writs of error or a supersedeas have been desired, that they have been issued or allowed under these statutes, upon the order and direction of a justice of this court.

As we have shown, the constitutional provisions on the subject have not been changed from the first. Provisions, identical with our own, are contained in the Constitutions of many of the States—for instance, of Alabama, California,

4

Iowa, Michigan, Wisconsin, Nevada—in respect to the issuing of process by their appellate courts, and the statutes made under them contain provisions that certain writs are to be allowed and their effect determined by the order of a Judge or Justice of the appellate court upon inspection of the record; the language used being generally like that of our statute. In only two or three of the States do their Constitutions *expressly* authorize one of the Justices to make such orders. In nearly all the States the justices are authorized by statute to approve bonds, administer oaths, &c., as preliminaries to the issuing of process; and the judges and justices of the different States are in the practice, under such statutes, of doing precisely what the Justices of the Supreme Court of Florida have always practiced. The practice having so long been established in this State, it is presumed that if the framers of the Constitution of 1868 had intended to change or prohibit it, they would have so indicated, otherwise it may be presumed that they intended to acquiesce in the construction uniformly given.

The Constitution also provides that the circuit *courts* and the *judges* thereof shall have power to issue all writs proper and necessary to the complete exercise of their jurisdiction; and who will say that because the power to issue writs is given thus to the court or judge, therefore the clerk may not be authorized by law to issue the writ of summons or subpœna, with or without the action of the court or judge, for the purpose of commencing a suit or procuring the attendance of witnesses? Yet, it will be observed, the language used, conferring upon the circuit courts the "power to issue" process, is identical with that used in conferring the power upon this Court to issue all writs deemed necessary or proper to the "complete exercise of its jurisdiction."

Indeed it would be strange, (the appellate court not being always in session, the Constitution contemplating vacations and fixing the time of holding the terms,) that under a provision that the court may issue certain writs necessary to

give them control over the proceedings of other courts, it should be held that the Legislature could not regulate the practice therein and authorize the issuing of writs out of such courts, and give them certain effect, upon the order of one or more of the justices or of a circuit judge, or in such other manner and on such terms as might be deemed proper for the furtherance of justice. That is very certainly and very properly within the province of the Legislature, like other matters of practice which are generally regulated by statutes. Otherwise parties might be deprived of the benefit of an appeal or writ of error until the happening of an annual term of the court, and meantime suffer irreparable injury. Neither life nor property nor reputation would be safe from the effects of the errors and blunders which sometimes creep into the proceedings of courts.

The order of the justice or judge is in no sense a determination of any question involved in the case, but only that the appeal or writ of error is not apparently frivolous, and that the security given is sufficient to protect parties against the effect of suspending the operation of the order, judgment or decree appealed from, and that proceedings thereunder ought to cease until the cause can be heard before the court. And we can scarcely conceive it possible that all such statutes, and such practice of the appellate courts of the country, have been really unconstitutional and void, the judge and justices deserving of censure for acting under them, and that the discovery thereof has been postponed until the present occasion. If so, the bar of the State and all the preceding Legislatures must bear their share of the odium.

We are of the opinion, however, that the statutes referred to are valid, that they are not abrogated, and that the supersedeas was properly allowed in the case out of which this matter has grown; the inhibitory process issued " being matter of form, in pursuance of the suspending nature of the appeal."

The inquiry next arises : What is the effect of a super-

sedeas in cases of appeal from the interlocutory orders grant-
ing an injunction and appointing a receiver?

These orders were made by the circuit judge at Chambers
and without notice. With the regularity of these proceed-
ings we have now nothing to do. The law points out the
means by which the opposing party may be relieved of the
operation of interlocutory orders, viz: by an appeal and giv-
ing security to indemnify the party in whose behalf the
orders were made, and thereupon obtaining the order of a
circuit judge or one of the justices of this court. The object
of the security is to indemnify the party against the conse-
quences of the suspension of the order appealed from. The
security stands in the place of the action of the receiver un-
til the matter can be heard and determined upon the appeal
in this court.

Authorities directly in point are few, owing to the fact
that in most of the States appeals have not been allowed
from interlocutory orders. We will refer however to cases
more or less analogous in principle.

In the case of Boyle vs. Zacharie and Turner, 6 Peters,
648, cited by counsel for respondent, a judgment had been
obtained in the district of Maryland. A *fieri facias* was is-
sued and levied in March, and in April a bill was filed to
stay proceedings at law upon the judgment, and an injunc-
tion was granted. In August a writ of venditioni exponas
was issued to the marshal, who in December term made
return that he had received the amount of the execution from
the defendant, and had it ready to bring into court. The
defendant at the same term moved to quash the writ of ven-
ditioni exponas for causes stated, and " that according to
the uniform and immemorial usage in the State of Maryland
with regard to the State courts, whenever a writ of *fieri fa-
cias* had been levied, and the proceedings had been stayed
by injunction before the sale, the officer who had the writ of
*fieri facias,* delivered up the property seized to the defendant
at law, upon the service upon the said officer of notice of the

writ of injunction." The court say : " The very ground of argument to maintain the motion to quash is, that the injunction operated as a supersedeas of the execution, according to the acts of Maryland regulating proceedings in Chancery and injunctions, which give to an injunction the *effect of a supersedeas at law*. But the acts of Maryland regulating the proceedings on injuctions and other chancery proceedings, and giving certain effects to them in courts of law, are of no force in relation to the Courts of the United States." ** " Nothing is better settled at the common law than the doctrine that a supersedeas, in order to stay proceedings on an execution, must come before there is a levy made under an execution, for if it comes afterwards, the sheriff is at liberty to proceed upon a writ of venditioni exponas to sell the goods." A number of English and American authorities are cited in support of this rule of the common law, most of which authorities are cited in Tidd's Pr., 1072-3. And by referring to Tidd, it will be seen that this is the rule *where no bail is put in*, as will be presently noticed.

In the case of Hardeman vs. Anderson, 4 How., 640, also cited by the counsel for respondent, a writ of error had been issued and afterwards dismissed, whereby the party lost the benefit of a supersedeas, and another writ of error was sued out, whereupon an application was made to the Supreme Court that a writ of supersedeas be awarded, and the court awarded it " under the general powers of the court," and the court entered this order : " Whereupon it is now considered and ordered by this court, that a writ of supersedeas be and the same is hereby awarded, commanding the judges of the circuit court of the United States for the Southern District of Mississippi to stay any execution or proceedings on the judgment of the said circuit court in this case pending this writ of error, and also command the marshal of the United States for the said district, that from every and all proceedings on execution or in anywise molesting the plaintiffs in

error on account of the said judgment, he entirely surcease, *the same being superseded.*"

The distinction is this, that the Supreme Court of the United States in virtue of *its general powers* directed a susedeas, whereas our statute in reference to appeals in chancery provides that a supersedeas may be ordered by a judge of the circuit court or a justice of this court on security being given.

Where an appeal is rightfully made, the judgment from which the appeal is taken becomes wholly inoperative. Penhallow vs. Doane, 3 Dallas, 87; Keen vs. Turner, 13 Mass., 266; Yeaton vs. U. S., 5 Cranch, 281; Wade vs. The Colonization Society, 4 Sm. & Mar., 671; Helm vs. Boone, 6 J. J. Mar., 351.

While an appeal is pending, every proceeding under the original judgment is void. Thompson vs. Thompson, Coxe, N. J., 159; Tidd's Pr., 337.

On taking an appeal from a final judgment, and obtaining a supersedeas, a sheriff is bound to release a levy under an execution issued upon the judgment. Rucker vs. Harrison, 6 Mumford, 181.

The appeal was a supersedeas, and the appellee having afterwards proceeded upon the execution already issued, the opposite party had a right to call upon the court to restrain him by a rule. Sholts vs. Judges of Yates, 2 Cow., 506.

In Walker vs. McDonnell, 4 Sm. & Mar., 118, the court said, the practice had always been in that State, on a supersedeas after levy, to return the property to the defendant.

In the case of the Lessee of Brisbee vs. Hall, 3 Ohio, 449, where an injunction was issued staying proceedings on an execution, the court say: It was lawful for the sheriff, upon service of the injunction, to re-deliver the goods to the owner. The injunction bond was substituted for the plaintiff's security.

In Eldridge vs. Chambers, 8 B. Monroe, 411, the court says: When an officer returns an execution levied, and

stopped or stayed by injunction or supersedeas, the return imports a cessation of the levy and a release of the property.

In Conway vs. Jett, 3 Yerger, 481, the practice is recognized, that where an execution is enjoined after levy, and security given, the property is to be returned to the debtor.

In Hudson vs. Smith, 9 Wis., 122, the court say: the very idea and object of an appeal seem entirely repugnant to the idea that the party, notwithstanding the appeal, may go on in the court below and *execute the judgment or order appealed from.*

After a writ of error was allowed, the sheriff having levied, and *no bail* having been put in, the court held, upon that ground, that the writ of error was no supersedeas or stay of execution, but if the writ of error had been followed by putting in bail, it would have operated as a supersedeas. Tidd's Pr., 1073; 2 T. R., 45.

The case of Archer vs. Hart & Sammis, 5 Fla., 234, arose when the law provided that thirty days should elapse after the pronouncing of a final decree before it should be engrossed and signed. The court say: "If the execution of the decree had been commenced, the supersedeas would arrest the proceedings at the stage in which they were when the supersedeas was allowed. * * * If the party had suffered the time to have passed, and the execution of the decree had been *consummated* by the discharge of the boy Dennis and the cancellation of the bond, (pursuant to the terms of the final decree,) and he then had prayed an appeal and obtained an order for a supersedeas, *such* order would not have retroacted so as to make void what had been done in executing the decree."

This is upon the familiar general principle, that whenever rights have become vested in pursuance of a final judgment or decree, (as by the purchase of property, being fully executed,) before any steps have been taken to reverse such judgment or decree, they will not be disturbed, though the judgment or decree may be subsequently reversed.

The allowance of a supersedeas does not, nor does the order in this case "undo" or reverse the order of the circuit judge. The order, following the intent and effect of the law, in terms directs a stay of all proceedings under the several orders appealed from, and suspends their operation. The power of the circuit court was suspended, and thereby the power of all the officers in that court, under its orders in question, became inoperative. They no longer had any duties to perform under such orders. The authority of the receiver to continue to act as such, was made nugatory by the operation of the law. He had entered upon an office and commenced to act, when the office was suspended. The supersedeas as understood by us, and as seems to be understood by the courts, does of necessity retroact by suspending the life of the order appealed from; reaches back to that order and forbids action under it.

It does not make *unlawful* an act done in pursuance of the order before the appeal was taken, but it forbids the court and its officers further to act. No new rights having been created, and the duties of the receiver being superseded, the bond standing in the place of the property in his hands, and he having been notified thereof by proper process, it was his duty to restore that which had come to his hands, to the parties from whom it had been taken and withheld; for his authority to take, being inoperative by the suspension, his authority to hold was equally so, both being derived from the same order.

We have seen that the effect of a supersedeas, upon a final decree, depended upon what had been done in pursuance of it. A final decree is supposed to be pronounced with deliberation, upon competent proofs and with due notice to parties. Hence new rights, duties and interests may be created which become fixed and irrevocable; but it is not so of an interlocutory order, made at the outset, and perhaps before the parties having large interests at stake are summoned, or even before they suspect the attack of the complaining party.

From the proceedings in the case it was impossible that any new interests could have been created.

Let us inquire whether, from the nature of the case, there could be any doubt as to the effect of the stay of proceedings and the duty of the receiver, even though it had not been plainly pointed out to him in the formal mode pursued. For the process served was a notice of the supersedeas and of its legitimate effect; or, as Mr. Justice Cushing remarks in Penhallow vs. Doane, " the inhibitory part is rather matter of form, or *in pursuance of the suspending nature of the appeal*, and as a further guard and caution." Here the order appointing the receiver is suspended by the force of the law. That order, as before recited, directed him to take possession of certain railroads, to operate the same, to receive their revenues, to pay their expenses, to construct a railroad (in pursuance of an alleged contract,) out of the earnings to be received. Now, when the powers of the circuit court and the duties of its officers under the superseded order were suspended, what was the effect of the suspension? It seems to us that it was legally and logically this : the court and its officers are required to surcease and desist from taking and holding the railroads, their property and moneys; stop operating the same; stop receiving the revenues; paying expenses; building railroads out of the revenues; make no contracts; leave the roads as you found them until the determination of the matter by the court having cognizance of it.

The appellants gave a bond which was approved by the circuit judge and by a justice of this court. It was given in accordance with the requirements of law, and to the end that their appeal should operate as a supersedeas. Is it true that an order may be appealed from and a supersedeas allowed, and yet that the order retains its life and force because it had been issued and served before the defendants could perfect their appeal? If so, of what avail and to what end is a stay of proceedings, and what is stayed? Did the

law require this large security merely that the taking an appeal might be rendered inconvenient, or rather that some substantial purpose might be subserved, corresponding with the evident object of the statute? If the *effect* of the order appealed from be not reached, why has the Legislature provided that the supersedeas may be allowed?

The power of the circuit court over the matter being suspended, to what tribunal is the receiver amenable, if he must needs continue to act as though no appeal had been taken? If any part of the order appealed from be suspended, what part? and who shall determine how far he may act, and when to cease?

It is no answer that the receiver has given security for the performance of the duties required by the order appointing him, and that such bond obliges him to obey the circuit court. The bond enures to the benefit of the parties appealing, as well as to others; and he is amenable to the court having authority for the time being, in the due course of law. We fail to perceive how he is to be damnified, if, pursuant to law, the property be returned to the parties entitled, the appellants having given security for the protection of all other parties. There is little danger that courts will not protect officers or persons who act according to law and in obedience to their orders.

But what is the effect of the action of the receiver in refusing to comply with the law? He has no longer any authority or righr, as such, to operate railroads, or to build railroads, or to pay their expenses, or to receive their revenues, or to hold railroad property, because his powers, under the order appointing him, are suspended; yet he refuses to recognize his lawful duty when plainly pointed out to him, refuses to return the property and effects, and thereby the parties previously in possession are prevented from taking and operating the roads, or paying their expenses out of the revenues. The receiver having no authority further to operate the roads, and refusing to allow the *prima facie* owners

so to do, the necessary result is that the roads must cease their operations and business, the engines and cars must rest quietly upon the track, and the operatives be discharged, until the appeal be disposed of. Not only the parties directly interested in the roads, but the public, who are much more interested, must suffer under this state of affairs.

The appeal gave to this court the control of the matter appealed, under the Constitution and the laws, and the effect of the appeal is the law of this court as well as the law of the circuit court and its officers and agents. The order staying proceedings does not discharge the receiver, but suspends him and all his powers and duties as an officer of the circuit court. The order is, of necessity, a mandate to that court, and its effect is a prohibition; (5 Dane's Abr. Ch. 138, Art. 7,) otherwise it is an idle ceremony.

If it has not the qualities we have ascribed to it, of what possible avail is it? Merely prohibiting the court from further action, under the order appealed from, is nothing. That the Receiver shall remain with full powers after his authority is suspended, or that an officer of the court may proceed to execute a decree after an appeal and a stay of proceedings under the decree, are propositions which we think cannot be maintained.

It is inherent in the nature of judical authority that every court may protect and maintain its jurisdiction under the law, and that it shall protect itself against all attempts to resist, or thwart, or overthrow its authority. Without the power to judge of its jurisdiction, it is practically without jurisdiction. Without the power to enforce its judgments, it has no judicial authority. That it be made the plaything of whosoever may choose to deride its judgments or its process, and ignore its existence and its acts, because the opinions of the Judges and the judgments of the court may not meet the approval of counsel upon the one side or the other of a controversy, or may not be in accordance with the opinions or the wishes of subordinate officers, cannot be allowed

without surrendering the judicial character and confessing the impotency of this department of the government. Courts commit errors, and parties may suffer from the improvidence or corruption of their Judges, yet the remedy for these is not in individual resistance or in a resort to private judgment. Every court will hear the appeals of those who conceive themselves to be wronged or threatened with injustice by the execution of its decrees. If its errors be made apparent, it will do justice to itself by dealing justice to parties without fear and without hesitation. There is no excuse for resistance of the orders of the courts in this country where their doors are wide open, and where every human being may be heard in the presence of the whole people.

In the case before us, we regret to conclude that the respondent is without lawful excuse for his disregard of duty, of the authority of this court, and of the law of the case, and he is therefore adjudged to be in contempt, and that his misconduct aforesaid was and is calculated to impair and impede the course of justice, and to prejudice the rights of the appellants in the cause referred to.

It is thereupon ordered and adjudged by the court, that the said James W. Johnson stand committed to the jail of the county of Leon, without bail, until he shall fully purge himself of the said contempt by restoring or surrendering to the Tallahassee Railroad Company, or to Franklin Dibble, the President thereof, or other proper officer of said company, the said Tallahassee Railroad, (otherwise called the Pensacola and Georgia Railroad and the Tallahassee Railroad,) and the moneys received by said James W. Johnson, as Receiver, except so far as he has paid out the same in operating the said road or roads according to the interlocutory decree or order of the Circuit Court of Duval county appointing him as such Receiver, and until the further order of this court in the premises.

The State vs. Johnson—Opinion of Court.

HART, J., delivered the following concurring opinion :

Concurring in the opinion just delivered, I desire to state, though it may be nothing new, the subjects being all so ably treated by the Chief Justice, that I do not understand the Constitution as abrogating the statute which authorized one of the Justices of this Court to order a stay of proceedings in case of an appeal from an interlocutory order of the Circuit Court.

In the system of governments, provided for by the Constitution of the United States, when a new State Constitution is made, it is to be construed and understood as being made in reference to and in approval of long existing statutes, unless it expressly annuls or changes them.

The making the order for a stay of proceedings as specific and comprehensive as the nature and circumstances of the case seem to require, is a necessary consequence of the present statutory authority to make the order.

In a proceeding like this, very carefully and guardedly authorized by statute, the *order* is for the purpose of having the appeal from the interlocutory order of the Circuit Court operate as a supersedeas.

The orders granting preliminary injunctions and appointing Receivers, made by the Circuit Courts, are interlocutory orders.

A supersedeas in a case like this is not simply a dead-lock and nothing more—great would be the injury to enterprise and scandal to the law if it were. It is a living operative authority intended to accomplish some good end in the case to which it applied. It necessarily supersedes the operation of the interlocutory order appealed from in all its stages and restores the thing operated upon, or else it is a mockery, and the statute authorizing it never had any of the effect which it was intended to have. An appeal taken from a final decree in a certain time and manner prescribed by law, is a supersedeas without any order of any Judge to make it

so; but, being taken from a final decree, of course can, as a supersedeas, accomplish little more than to stay execution; but taken from an interlocutory order, is not and should not be in all cases necessarily so confined or limited. The whole benefit and primary object of the statute of 1852 would entirely fail under such a limiting construction.

The order for a stay of proceedings may be extensive enough to reach and affect all the proceedings affecting those appealed from, and the precept or process in pursuance of the order may be issued from the office of the Clerk of the Court, where the Justice making the order sits as Judge, under the seal of the court, for this course secures the enforcing of the statute. When he so orders, and it issues out of the Clerk's office with the seal of the court attached, it becomes the process or writ of the court, and as such must be respected and obeyed. If there is any error in it, disobedience or defiance is not the proper way to correct the error. No officer of this or of the Circuits Court whose acts it purports to control or direct, can with impunity disregard or disobey its commands.

If this court corruptly errs, the Legislature that represents the highest power, the people, who have prescribed what their Legislature as well as their courts may do, may apply the corrective.

The only question now here is, Has the writ of supersedeas been obeyed? The Receiver answers substantially that he is not guilty of contempt in not obeying it, because he says that the writ was not ordered and issued by lawful authority. This is no answer, except as an avowal of disregard, and coming from a subordinate officer of the Circuit Court is, to say the least, very improper.

Whether that writ is regular or not, is no concern of his any more than the validity of an order would be to a master or of any writ to a sheriff. It concerns the party to the suit, who has had abundant time and opportunity to raise that question before this court by motion, and has not done

so.   The Receiver admits that he has not obeyed the writ, and presents a question which for him is out of place, and which is no excuse.   Thus the affidavit of non-obedience, upon which the attachment was ordered, is fully sustained and proved of record to be true.   There is nothing left for this court to do but to punish the contempt of its process and enforce obedience thereto, or else continue to be contemned and despised.   There is no cause or reason for even some leniency.   This is the first time in the history of Florida that the process of this tribunal has been by an officer of a court intentionally disregarded and the act deliberately avowed by him in open court.   It is to be hoped that it will be the last.   Whatever some men may choose to think of others as men, the *tribunal* must be everywhere respected by at least implicit obedience to its process.   Without this, the fabric of jurisprudence, erected by the experience of ages, the best constituted safe-guard of human rights, must fall.   Great, beneficial and beautiful as it is, it is a delicate structure, and cannot maintain its usefulness under frequent shocks of disrespect.   It has its enemies, as is patent in this case, so also has everything that is beautiful and good.